EPSTEIN BECKER & GREEN, P.C.
Traycee Ellen Klein
250 Park Avenue
New York, New York 10177
(212) 351-4500
*Attorneys for Defendants*
*North Shore-Long Island Jewish Health System, Inc.,*
*North Shore University Hospital, and*
*Mario Nistico*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ELIJAH CRAWFORD AND ISHMAEL COX,

             Plaintiffs,

    - against -

NORTH SHORE - LONG ISLAND JEWISH
HEALTH SYSTEM, INC., NORTH SHORE
UNIVERSITY HOSPITAL, MARIO NISTICO,
individually, CHARLES DR. MILITANA, M.D.,
individually, and NORTH AMERICAN
PARTNERS IN ANESTHESIA, L.L.P.

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ECF Case**

Civ. Action No.: 13-3894 (JFB) (ARL)

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF BACKGROUND AND UNDISPUTED FACTS ............................................2

ARGUMENT ....................................................................................................9

I.   PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS ARE
     WITHOUT MERIT ........................................................................................9

     A.   Plaintiffs' Claims for Hostile Work Environment Fail as a Matter of Law ....................11

     B.   Other Alleged Offensive Conduct Cannot be Considered by the Court .........................16

          1.   The Applicable Statutes of Limitations .................................................17

          2.   The Alleged Offensive Comments Based on Race Are Not
               Severe or Pervasive .................................................................19

     C.   The Alleged Discriminatory Conduct Cannot be Imputed to the Hospital ....................21

II.  Plaintiffs' Retaliation Claims Also Fail As A Matter of Law ................................24

III. Plaintiffs' Claims Against Nistico Must Be Dismissed ......................................28

CONCLUSION ...................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alexander v. Westbury Union Free Sch. Dist.*,
 2011 U.S. Dist. LEXIS 127738 (E.D.N.Y. 2011) ................................................30

*Annis v. County of Westchester*,
 136 F.3d 239 (2d Cir. 1998) .........................................................................18

*Augustin v. Yale Club of N.Y.C.*,
 2006 WL 2690289 (S.D.N.Y. Sept. 15, 2006),
 *aff'd*, 274 F. App'x 76 (2d Cir. 2008)............................................................20

*Baskerville v. Culligan Int'l Co.*,
 50 F.3d 428 (7th Cir. 1995) .........................................................................19

*Bellows v. Amoco Oil Co.*,
 118 F.3d 268 (5th Cir. 1997) .......................................................................28

*Brennan v. Metro. Opera Assoc., Inc.*,
 192 F.3d 310 (2d Cir. 1999) .........................................................................20

*Bright v. Coca Cola Refreshments USA, Inc.*,
 2014 U.S. Dist. LEXIS 155565 (E.D.N.Y. Nov. 3, 2014)..........................23

*Brown v. Orange & Rockland Utils., Inc.*,
 594 F. Supp. 2d 382 (S.D.N.Y. 2009) .........................................................22

*Callahan v. Consolidated Edison Co. of New York*,
 187 F. Supp. 2d 132 (S.D.N.Y. 2002) .........................................................29

*Carter v. New Venture Gear, Inc.*,
 2007 U.S. Dist. LEXIS 71695 (N.D.N.Y Sept. 26, 2007),
 *aff'd* 2009 U.S. App. LEXIS 3237 (2d Cir. Feb. 18, 2009)........................13

*Clark Cnty. Sch. Dist. v. Breeden*,
 532 U.S. 268 (2001).....................................................................................27

*Das v. Consol. Sch. Dist. of New Britain*,
 369 Fed. Appx. 186 (2d Cir. 2010)........................................................10, 11

*De La Peña v. Metro. Life Ins. Co.*,
 953 F. Supp. 2d 393 (E.D.N.Y. 2013) .........................................................29

*Duch v. Jakubek*,
 588 F.3d 757 (2d Cir. 2009) ...................................................................10, 24

i

*Dye v. State Dep't of Corr.*,
   2011 U.S. Dist. LEXIS 75366 (S.D. Ind. July 12, 2011) ........................................................26

*Faulkner v. Niagara Mohawk Power Corp.*,
   2006 U.S. Dist. LEXIS 80670 (N.D.N.Y. Nov. 3, 2006) ..................................................13, 14

*Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.*,
   2012 U.S. Dist. LEXIS 139702 (E.D.N.Y. Sept. 27, 2012) .................................................11

*Francisco v. Verizon South, Inc.*,
   756 F. Supp. 2d 705 (E.D. Virg. 2010) ...............................................................................15

*Goodman v. Port Authority of New York & New Jersey*,
   850 F. Supp. 2d 363 (S.D.N.Y. 2012) ................................................................................10

*Gordon v. City of New York*,
   2015 U.S. App. LEXIS 8362 (2d Cir. N.Y. May 21, 2015) ...............................................11

*Harris v. Forklift Sys., Inc.*,
   510 U.S. 17 (1993).................................................................................................................9

*Hicks v. Baines*,
   593 F.3d 159 (2d Cir. 2010) ..........................................................................................25, 29

*Hicks v. IBM*,
   44 F. Supp. 2d 593 (S.D.N.Y. 1999) ...................................................................................28

*Kassner v. 2nd Ave. Delicatessen Inc.*,
   496 F.3d 229 (2d Cir. 2007) ...............................................................................................17

*Kirkland v. Cablevision Sys.*,
   760 F.3d 223 (2d Cir. 2014) ...............................................................................................24

*Kotcher v. Rosa and Sullivan Appliance Ctr.*,
   957 F.2d 59 (2d Cir. 1992) .................................................................................................10

*Krachenfels v. N. Shore Long Island Jewish Health Sys.*,
   2014 U.S. Dist. LEXIS 103474 (Bianco, E.D.N.Y. 2014) ...................................................18

*Little v. NBC*,
   210 F. Supp. 2d 330 (S.D.N.Y. 2002) ................................................................................10

*Lovejoy-Wilson v. Noco Motor Fuel, Inc.*,
   263 F.3d 208 (2d Cir. 2001) ...............................................................................................24

*Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*,
   842 F.2d 590 (2d Cir. 1988) ...............................................................................................25

FIRM:30566329v1

*Mathirampuzha v. Potter,*
    548 F. 3d 70 (2d Cir. 2008) ..................................................................................20

*McCoy v. City of New York,*
    131 F. Supp. 2d 363 (E.D.N.Y. 2001) ...................................................................19

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ..............................................................................................24

*McGullam v. Cedar Graphics, Inc.,*
    609 F.3d 70 (2d Cir. 2010) ...................................................................................18

*Notaro v. Fossil Industries, Inc.,*
    820 F. Supp. 2d 452 (E.D.N.Y 2011) ...................................................................22

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998) ................................................................................................11

*Patterson v. Cnty. of Oneida,*
    375 F.3d 206 (2d Cir. 2004) ...................................................................................9

*Perry v. Ethan Allen, Inc.,*
    115 F.3d 143 (2d Cir. 1997) ...........................................................................10, 21

*Petrosino v. Bell Atl.,*
    385 F.3d 210 (2d Cir. 2004) .......................................................................10, 11, 21

*Pilgrim v. McGraw-Hill Cos.,*
    599 F. Supp. 2d 462 (S.D.N.Y. 2009) ....................................................................9

*Quinn v. Green Tree Credit Corp.,*
    159 F.3d 759 (2d Cir. 1998) ..........................................................10, 17, 18, 21

*Ramos v. City of N.Y.,*
    1997 WL 410493 (S.D.N.Y. July 22, 1997) .........................................................25

*Raspardo v. Carlone,*
    770 F.3d 97 (2d Cir. 2014) .....................................................................................9

*Redd v. New York Div. of Parole,*
    678 F.3d 166 (2d Cir. 2012) .................................................................................11

*Richardson v. New York State Dept. of Corr. Ser.,*
    180 F.3d 426 (2nd Cir. 1999) ...............................................................................10

*Rivera v. Rochester Genesee Reg'l Transp. Auth.,*
    743 F.3d 11 (2d Cir. 2014) ...................................................................................28

iii

*Rojas v. Roman Catholic Diocese of Rochester*,
 660 F.3d 98 (2nd Cir. 2011) ...........................................................................23

*Salmon v. Pliant Corp.*,
 965 F. Supp. 2d 302 (W.D.N.Y. 2013)............................................................23

*Satterwhite v. City of Houston*,
 2015 U.S. App. LEXIS 3370 (5th Cir. 2015) ..................................................26

*Tadros v. Coleman*,
 898 F.2d 10 (2d. Cir.), *cert. denied*,
 498 U.S. 869 (1990)..........................................................................................17

*Taylor v. New York City Dept. of Educ.*,
 2012 U.S. Dist. LEXIS 108319 (E.D.N.Y. Aug. 2, 2012)...............................11

*Tepperwien v. Entergy Nuclear Operations, Inc.*,
 663 F.3d 556 (2d Cir. 2011) ............................................................................28

*Tomasino v. St. John's Univ.*,
 2010 WL 3721047 (E.D.N.Y. Sept. 23, 2010),
 *aff'd*, 476 F. App'x 923 (2d Cir. 2012)............................................................25

*Trinidad v. N.Y.C. Dep't of Corr.*,
 423 F. Supp. 2d 151 (S.D.N.Y. 2006) .............................................................20

*Turner v. Baylor Richardson Med. Ctr.*,
 476 F.3d 337 (5th Cir. 2007) ...........................................................................27

*Whidbee v. Garzarelli Food Specialties, Inc.*,
 223 F.3d 62 (2d Cir. 2000) ..............................................................................29

*Wilson v. N.Y. City DOT*,
 2005 U.S. Dist. LEXIS 21620 (S.D.N.Y. Sept. 27, 2005)...............................23

FIRM:30566329v1

## PRELIMINARY STATEMENT

Defendants North Shore-Long Island Jewish Health System, Inc. (the "Health System"), North Shore University Hospital (the "Hospital"), and Mario Nistico ("Nistico") (hereinafter, unless otherwise noted, collectively referred to as "Defendants"), respectfully submit this memorandum in support of their Motion for Summary Judgment to dismiss the Amended Complaint filed by Plaintiffs Ishmael Cox ("Cox") and Elijah Crawford ("Crawford"). Plaintiffs commenced this action by filing a Summons and Complaint with the Clerk of the Court on July 12, 2013, and thereafter filed an Amended Complaint on September 3, 2013 (hereinafter referred to as the "Complaint.").[1]   In the Complaint, Plaintiffs assert causes of action for discrimination on the basis of race and retaliation. The claims against the Health System and the Hospital are brought under 42 U.S.C. § 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and the New York State Human Rights Law, New York Executive Law §§ 290, *et seq.* ("NYSHRL"). The claims against Nistico are brought under § 1981 and the NYSHRL in his individual capacity.

Summary judgment should be granted in favor of Defendants on Plaintiffs' race discrimination claims because (i) the act alleged by Plaintiffs to have created the hostile work environment did not occur because of race; (ii) other acts that Plaintiffs try to bootstrap into this lawsuit are time-barred; (iii) the other acts alleged, even if not time-barred, in whole or in part, do not establish  viable claims of a hostile work environment based on race; (iv) even if Plaintiffs could establish a viable claim of race discrimination on the basis of a hostile work environment, there is no basis to impute liability to the Hospital, Plaintiffs' employer; and (v) the individual

---

[1] The July 12, 2013 Complaint named the Health System, Nistico, North American Partners in Anesthesia, and Charles Militana as defendants.  On September 3, 2013, Plaintiffs filed an Amended Complaint, which added the Hospital as a defendant.

claims against Nistico fail as a matter of law.[2]  In addition, summary judgment should be granted

on Plaintiffs' retaliation claims because, based on their own sworn deposition testimony, there is

no protected activity and there is no adverse employment action.  As such, there can also be no

causal connection, a necessary element to establish a viable claim of retaliation.

### STATEMENT OF BACKGROUND AND UNDISPUTED FACTS

### I.      THE PARTIES, OTHER RELEVANT PEOPLE, AND THEIR POSITIONS

The Health System is a healthcare network comprised of member hospitals, long-term

care facilities, home care agencies and physician practices that serve people throughout Long

Island, Manhattan, Queens, and Staten Island. (56.1 at ¶ 5)  The Hospital is a member of the

Health System.  (56.1 at ¶ 6)  Crawford was hired by the Hospital in October 1997 and as of the

date of his deposition he had worked in Ambulatory Surgery as a Perioperative Assistant for

sixteen (16) years.  (56.1 at ¶ 1) Cox was hired by the Hospital in August 1996, and he began

working as a Perioperative Assistant in Ambulatory Surgery in October 2002. (56.1 at ¶ 2)  The

responsibilities of the Perioperative Assistants, such as Crawford and Cox, are to clean and

maintain the operating rooms and the other perioperative areas, as well as maintain supplies that

are needed in the Ambulatory Surgery Unit ("ASU").  (56.1 at ¶ 4)  Nistico has been employed

by the Hospital as a Surgical Technologist since 1988.  (56.1 at ¶ 7)  A Surgical Technologist is

responsible for preparing the operating rooms for surgical procedures and maintaining the safe

and sterile use of equipment during procedures.  (56.1 at ¶ 8)  Perioperative Assistants and

Surgical Technologists at the Hospital are co-workers, since neither position has supervisory

responsibility over the other, and both positions report to the Nurse Manager in the ASU. (56.1 at

---

[2] Plaintiffs incorrectly allege in the Complaint that they were employees of both the Health System and the Hospital. Defendants deny this allegation, but regardless, because summary judgment should be granted in favor of the Hospital on all of Plaintiffs' claims for the reasons herein, it should likewise be granted in favor of the Health System.

FIRM:30566329v1

¶¶ 12, 15)  The Nurse Manager during the time relevant to this lawsuit was Dawn Edge.  (56.1 at ¶¶ 13, 17)

Defendant North American Partners in Anesthesia ("NAPA") is a vendor that provides services to the Hospital and the Hospital's patients.  (56.1 at ¶ 9)  Defendant Charles Militana ("Militana") is employed by NAPA and he provides anesthesia services to patients at the Hospital through NAPA. (56.1 at ¶¶ 9, 10)  Militana has never been employed by the Hospital or the Health System, and he does not have any supervisory responsibility or authority in connection with employees of the Hospital.  (56.1 at ¶¶ 11, 16, 17)  The Hospital has a Human Resources ("HR") Department and Debi Solivan ("Solivan") was the HR Manager responsible for employees that worked in the ASU from February 2005 until December 2013.  (56.1 at ¶ 18)

## II.    THE POLICIES AND PROCEDURES

At all times relevant in this lawsuit, the Hospital (and the Health System) had zero tolerance for discrimination in the workplace, and it has many policies and procedures in place to insure that all employees know the Hospital's zero tolerance.  The policies and procedures (i) prohibit discrimination in the workplace; (ii) provide avenues of complaint for employees to report any experienced or witnessed discrimination or harassment; (iii) provide employees with alternative reporting procedures for lodging complaints of experienced or witnessed discrimination or harassment; and (iv) the policies strictly forbid retaliation against anyone for reporting discrimination or harassment, assisting in making a discrimination or harassment complaint, or cooperating in a discrimination or harassment investigation. (56.1 at ¶¶ 19-26, 116) The foregoing policies and procedures, hereinafter jointly referred to as "Policies," require that any employee that has experienced or witnessed harassment must promptly report the conduct. (56.1 at ¶¶ 22, 116)  Reporting is not optional, it must be done and it must be done in a timely

3

manner.  (56.1 at ¶¶ 24, 117)  If the Hospital does not know about alleged improper conduct it cannot do anything to stop the conduct. (56.1 at ¶ 119)

The Policies are distributed to employees at the time of hiring, and again during the employment, and are always available to employees on the intranet and in kiosks located throughout the Hospital.  (56.1 at ¶ 21)  Crawford and Cox were aware of the Policies: they received copies of the Employee Handbook throughout their employment and acknowledged receipt of the same. (56.1 at ¶ 26)  Crawford and Cox also participated in mandatory Hospital Training, training that covered the anti-discrimination and anti-harassment policies, as well as the mandatory reporting obligations of any actual or perceived discriminatory conduct that is going on in the workplace. (56.1 at ¶ 27)

### III.   THE FACTUAL ALLEGATIONS UNDERLYING PLAINTIFFS' CLAIMS

Plaintiffs commenced this action on July 12, 2013. (56.1 at ¶ 28)   Both Plaintiffs were deposed in this lawsuit and were asked at their depositions specifics about their claims and the factual allegations underlying their claims.  Both Crawford and Cox claim they were subjected to discrimination on the basis of their race, African American.  (56.1 at ¶ 3)  Cox and Crawford both admitted at their depositions that the only conduct they claim subjected them to discrimination on the basis of race related to an incident that occurred on July 19, 2012.  (56.1 at ¶ 29-31)  Cox was asked "So that we're clear, you're claiming that that one incident on July 19th was the only incident that created the hostile work environment based on your race that you complain[] about in the lawsuit," and he answered  "Yes." (56.1 at ¶ 30)   Likewise, Crawford was asked "The only thing you're claiming in this lawsuit is you believe that the July 19th locker room incident was offensive because of your race as being African-American, correct," and he answered "Yes." (56.1 at ¶ 31)

4

The locker room incident that Plaintiffs claim created a racially hostile work environment occurred, as they testified, on July 19, 2012. On July 19, 2012, Crawford came to work at around 6:30 am and he did not notice anything unusual. (56.1 at ¶ 34) Later that morning, after working for about two hours, Crawford claims he took a bathroom break, walked back into the men's locker room, and upon entering the locker room, saw a surgical cord fashioned as a hangman's noose hanging from Nistico's locker. (56.1 at ¶ 35) Crawford's locker was across the room from Nistico's locker, and Crawford knew it was Nistico's locker because the two had worked together up until this point for approximately sixteen (16) years. (56.1 at ¶¶ 36-37, 39) There was nothing written on the cord or on the locker to suggest that the rope was directed at anyone, and Crawford admitted at his deposition that Nistico knew which locker was his, and that had Nistico wanted to he could have taped the cord to Crawford's locker. (56.1 at ¶¶ 38-39, 44) Nistico's locker also had on the front of the door various stickers, one sticker depicting radioactive material, which stated "Biohazard," and two stickers from the Opie and Anthony radio show that said "WOW." (56.1 at ¶ 42) These stickers had been there before the morning of July 19, 2012. (56.1 at ¶ 42)

After seeing the cord hanging from Nistico's locker, Crawford walked out of the locker room, saw Cox, told Cox to come with him into the locker room, and proceeded to show him the cord. (56.1 at ¶ 40) Cox also knew which locker was Nistico's, and Cox admits that Nistico knew which locker was his (Cox's). (56.1 at ¶ 41) Crawford and Cox believe that the presence of the hangman's noose in the workplace, irrespective of context, constituted a crime, and so they reported the rope on Nistico's locker, not to their Supervisor or to HR, but to Hospital Security. (56.1 at ¶ 43) Crawford and Cox both admit that there were no racist comments or innuendos written on the locker, and Plaintiffs conceded at their depositions that a noose can be

5

used and displayed in a context that has no connotation whatsoever to race. (56.1 at ¶ 44) A picture of what Plaintiffs saw on Nistico's locker on the morning of July 19, 2012, is attached to the unverified Complaint at page 8. Security promptly responded, spoke with Crawford and Cox, and reported to Senior Management that there was a noose in the men's locker room. (56.1 at ¶¶ 45-49, 51) Security memorialized the morning's events in an Incident Report. (56.1 at ¶ 48) The Incident Report indicates that Crawford told the Security Officer that there was no prior history of problems with Nistico. (56.1 at ¶ 49) After speaking with the Security Officer, Crawford and Cox went back to work. (56.1 at ¶ 50)

Soon thereafter, Pat Moleski ("Moleski"), the Administrative Director of Perioperative Services, was told about the morning's events, and she promptly went to the ASU to find out what happened.[3] (56.1 at ¶ 50) Moleski got general information about what happened and quickly reported the situation to Solivan in HR. Solivan promptly investigated what happened. (56.1 at ¶¶ 52, 55) Solivan interviewed Nistico, Crawford and Cox the next day, on July 20, 2012. (56.1 at ¶¶ 54-72) Nistico admitted, as he had the day before, that he put the rope on his locker. (56.1 at ¶ 53) Nistico explained that on July 18, 2012, the day before the rope was placed on his locker, he was having a conversation with Militana about capital punishment and that during the conversation he styled the surgical cord into the hangman's noose. (56.1 at ¶¶ 58, 60) (*See also* (56.1 at ¶ 59)) The next day Nistico hung the surgical cord from his own locker in the men's locker room because he thought that the noose would fit the funny motif of things that were already on his locker, the Biohazard sticker and the WOW stickers from the Opie and Anthony radio show. (56.1 at ¶ 63) Nistico told the Hospital, and testified to the same at his

---

[3] While not materially relevant, but important for context, Patty Magnotta, the manager that reported the morning's event to Moleski, received word that morning that there was a "rope hanging in the men's locker room." Magnotta Tr. 33. Magnotta, while not asked at her deposition, has said that she initially thought, based on what was reported to her, that there was a rope hanging from the ceiling in the men's locker room and that someone might have committed suicide.

FIRM:30566329v1

deposition, that he had no intent to ever offend anyone when he put the rope on his locker. (56.1 at ¶ 64)

When Solivan met with Crawford on July 20 he confirmed the events that transpired on July 19 from his perspective, as did Cox when Solivan spoke with him later that same day. (56.1 at ¶¶ 65-71)  Crawford and Cox both told Solivan during their interviews that there had not ever been any other instances of offensive conduct involving Nistico or anyone else. (56.1 at ¶¶ 67, 72)

As of the time of the July 19, 2012, locker room incident, Nistico had been employed at the Hospital as a Surgical Technologist in the Hospital's ASU for over twenty years. (56.1 at ¶¶ 7, 73)  From the beginning of Nistico's employment until July 19, 2012, not one person at the Hospital had ever complained about, reported or even suggested inappropriate conduct, comment or innuendo by Nistico to Management or HR. (56.1 at ¶ 74)  As a result of all of the foregoing facts, the Hospital made a business decision to suspend Nistico without pay for one week. (56.1 at ¶¶ 74-76)   The Hospital also required Nistico to attend a diversity and inclusiveness class, which he did. (56.1 at ¶ 76)

Solivan left the employ of the Hospital in December 2013, a year and a half after the locker room incident.  (56.1 at ¶ 18)  At no time during Solivan's employment did Crawford, Cox, or anyone else report that Nistico made racially inappropriate or offensive comments in the workplace, and at no time did Crawford, Cox, or anyone else ever report that Militana made racially inappropriate or offensive comments in the workplace.  (56.1 at ¶ 79)

Both Crawford and Cox admitted at their depositions that the locker room incident they reported to Security on the morning of July 19, 2012, is the only incident of alleged race-based discrimination or harassment that they ever reported to the Hospital – either before or after.

(56.1 at ¶¶ 32, 33, 79)   Had Crawford or Cox, or anyone else for that matter, reported racially inappropriate or offensive comments, or any type of perceived wrongdoing, the Hospital would have acted promptly and in accordance with its Policies, which includes investigation of all complaints of discrimination and harassment, just like it did when Security reported the rope hanging on Nistico's locker on the morning of July 19, 2012.  (56.1 at ¶ 120)

While Crawford and Cox claim in this lawsuit retaliation, their deposition testimony establishes that they did not suffer any adverse employment action, as that terms is legally defined, after reporting the rope on Nistico's locker on July 19, 2012.  (56.1 at ¶¶ 99-115) Crawford admitted that as of the day of his deposition, September 19, 2014, the terms and conditions of his employment, including his position, title, salary, benefits, schedule and his assignments remained the same as they were immediately before July 19, 2012. (56.1 at ¶100) Cox also admitted that that the terms and conditions of his employment, including his position, title, salary, benefits, schedule and his assignments,  from July 19, 2012, until the date of his deposition (on September 19, 2014), were the same, or even better than they were before the reported incident to security. (56.1 at ¶¶ 106-15)

Importantly, Crawford and Cox both conceded at their depositions that they have no evidence, and are unaware, of anyone ever utilizing the Hospital's Policies to report actual or perceived discrimination and then being retaliated against.  (56.1 at ¶¶ 80-83)  Cox also admitted that he could not give any examples of management knowing of any inappropriate conduct by Nistico and not taking action. (56.1 at ¶ 84)   As is shown below, these facts are fatal to Plaintiffs' claims.

## ARGUMENT

### I. <u>PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS ARE WITHOUT MERIT</u>

In this case, Plaintiffs allege that they were subjected to a hostile work environment on the basis of their race, African American.  (56.1 at ¶ 3).  The standard for assessing the viability of a hostile work environment claim asserted under Title VII, Section 1981, and the NYSHRL is the same.  *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004); *Pilgrim v. McGraw-Hill Cos.*, 599 F. Supp. 2d 462, 468 (S.D.N.Y. 2009).  As such, these claims are analyzed and discussed in tandem herein.

To prove a hostile work environment claim under any of the applicable statutes, Plaintiffs must first establish through admissible evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  The racist conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and Plaintiffs must have subjectively perceived the alleged racist conduct to be abusive. *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). Relevant factors in determining whether the conduct is sufficiently pervasive "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.   In addition to establishing racially discriminatory conduct that is so severe or pervasive that it can reasonably be said to have altered the terms and conditions of employment, where the alleged harassment is perpetrated by co-workers or non-employees, such as Nistico and Militana, to overcome summary judgment there must also be admissible evidence in the record that would allow a reasonable person to conclude that the employer knew (or reasonably should have known) about the offending racist conduct

9

but failed to take appropriate remedial action.[4]  *See Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004).  In other words, the employer can only be liable if the plaintiff demonstrates that their "'employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'"  *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (*quoting Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir. 1994)).  *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) (stating that a co-worker's harassment can be imputed to the employer only if "the employer either provided no reasonable avenue of complaint or knew of the harassment and did nothing about it.");  *Kotcher v. Rosa and Sullivan Appliance Ctr.*, 957 F.2d 59, 63 (2d Cir. 1992);  *Richardson v. New York State Dept. of Corr. Ser.*, 180 F.3d 426, 436 (2nd Cir. 1999);  *Little v. NBC*, 210 F. Supp. 2d 330, 392 (S.D.N.Y. 2002) (In the context of non-supervisory harassment, the employer can only be held liable for its own negligence).  *See also*, *Das v. Consol. Sch. Dist. of New Britain*, 369 Fed. Appx. 186 (2d Cir. 2010);  *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) ("employer will be held liable only for its own negligence," and a plaintiff must demonstrate that the employer "failed to provide a reasonable avenue for complaint" or that "it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.");  *Goodman v. Port Authority of New York & New Jersey,* 850 F. Supp. 2d 363, 386-87 (S.D.N.Y. 2012) (an employer will only be responsible for the non-employee's discrimination in the workplace where the employer (or its

---

[4] In the Unverified Complaint, Plaintiffs, or more accurately their counsel, alleged that Militana and Nistico "held supervisory authority over Plaintiffs."  (Compl. ¶¶ 21-22).  As is established by all of the competent evidence, including the deposition testimony of both Plaintiffs, neither Nistico nor Militana are or were supervisors to Plaintiffs.  *See* (56.1 at ¶¶ 15-17)  In *Vance v. Ball State University*, the Supreme Court explained that an employee is a "supervisor" for purposes of the employer's vicarious liability under Title VII if he or she is empowered by the employer "to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" 133 S.Ct. 2434, 2443 (2013) (*quoting Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  Neither Nistico nor Militana are, or were, empowered to take tangible employment actions against Plaintiffs. *See* (56.1 at ¶¶ 16-17)

10

agents or supervisory employees) knew or should have known of the discriminatory conduct and failed to take immediate or appropriate corrective action).

As demonstrated below, Plaintiffs in this case cannot satisfy their burden to establish a *prima facie* case of race discrimination.  As such, summary judgment is warranted.

### A. Plaintiffs' Claims for Hostile Work Environment Fail as a Matter of Law

As this Court knows, the anti-discrimination employment laws do not set forth a "general civility code for the American workplace." *Redd v. New York Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (*citing Harris v. Forklift Sys., Inc.*, 510 U.S. at 21).  *See also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Petrosino*, 385 F.3d at 223; *Taylor v. New York City Dept. of Educ.*, 2012 U.S. Dist. LEXIS 108319, 2012 WL 3150388, at *8 (E.D.N.Y. Aug. 2, 2012).  Your Honor expressly recognized this extremely important part of the law in *Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.*, 2012 U.S. Dist. LEXIS 139702, at *60 (E.D.N.Y. Sept. 27, 2012) wherein it was held that general claims of uncivilized behavior, unrelated to a person's status in a protected class, are not cognizable under Title VII.

To insure that the anti-discrimination laws do not become a general civility code, the law requires that in order to defeat a summary judgment motion, a plaintiff alleging a race-based hostile work environment claim must be able to point to evidence in the record that demonstrates that the complained of conduct occurred "because of" the employee's protected characteristic. *See Gordon v. City of New York*, 2015 U.S. App. LEXIS 8362, at *5-6 (2d Cir. N.Y. May 21, 2015) ("it is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable . . . only when it occurs because of an employee's protected characteristic.")(*citing Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)). *See also Das v. Consol. Sch. Dist. of New Britain*, 369 Fed. Appx. 186, 190 (2d Cir. 2010) (affirming district court's granting of summary judgment on

11

plaintiff's hostile work environment claims because there was no evidence in the record to establish that the plaintiff was exposed to the offending conduct because of her race or ethnicity.)

As previously explained, the alleged racially discriminatory conduct that Plaintiffs' complain about is the noose on Nistico's locker on July 19, 2012. (56.1 at ¶ 29-31) ("Q. So that we're clear, you're claiming that that one incident on July 19th was the only incident that created the hostile work environment based on your race . . . A. Yes.""Q. The only thing you're claiming in this lawsuit is you believe that the July 19th locker room incident was offensive because of your race . . .A. Yes." (56.1 at ¶¶ 30, 31) In this case, however, the noose cannot serve as the basis for a discrimination claim because there is no evidence to suggest that the rope on Nistico's locker had anything whatsoever to do with Plaintiffs, or their race. In fact, Crawford and Cox both concede that there were no racist comments or innuendos written on the locker, and both concede that a noose can be used and displayed in a context that has no connotation whatsoever to race. (56.1 at ¶ 44) Even though there is no context or circumstances to suggest that the display of the noose was racially motivated, Plaintiffs believe that the display of the noose, in and of itself and irrespective of context or circumstances, is a crime and that since it is a crime it also equates to a violation of the employment discrimination laws. (56.1 at ¶ 43) Of course, this is not true. For purposes of this memorandum of law, this legal theory advanced by Plaintiffs will be referred to as the "mere exposure theory."

Courts in this Circuit have previously dealt with the "mere exposure theory" and have concluded it does not have merit. While a noose can, both in and out of the workplace, be used in a manner to display or express racial animosity, a noose in and of itself is not automatically racist. When analyzing whether a hangman's noose created or contributed to a racially hostile work environment, the court must look to the circumstances under which the noose appeared in

12

the workplace to determine whether its context is reasonably suggestive of racial animus. Of course this is necessary to insure that the anti-discrimination laws do not become general civility codes.  The practical analysis done by the courts in this Circuit, as well as in others, looks to context to determine if there is evidence in the record to establish that the plaintiff was exposed to the offending conduct "because of" the protected category, as required by the statutes and the Supreme Court.   Example of the mere existence theory abound.  For example, in *Carter v. New Venture Gear, Inc.,* the court found that the plaintiff could not establish that the hanging of a noose was racially motivated when a witness's (Pullen's) testimony established "that the noose had been left not for Pullen's daughter [(who was African-American)] but for a white person, and there was no evidence that the incident was racially related." *Carter v. New Venture Gear, Inc.,* 2007 U.S. Dist. LEXIS 71695, at *21 (N.D.N.Y Sept. 26, 2007), *aff'd* 2009 U.S. App. LEXIS 3237 (2d Cir. Feb. 18, 2009).

　　　Similarly, the mere existence theory of race discrimination was rejected in *Faulkner v. Niagara Mohawk Power Corp.*, 2006 U.S. Dist. LEXIS 80670 (N.D.N.Y. Nov. 3, 2006), a case eerily similar to the facts of this case.  In *Faulkner,* the plaintiff, a janitor, was assigned to work in a particular area on June 10, 2003.  The plaintiff entered an area called the 'bum's room'" to clean and she "observed a noose hanging in the room." Id. at *3.  She immediately reported the noose to a Union Steward who removed it. Id.  The next day, the plaintiff reported the noose to her supervisor and related to her that she believed it to be a sign of racial intimidation. *Id.*  The matter was investigated by the supervisor, and it was concluded that the noose had been hung as a joke directed at a particular white, male employee regarded as obnoxious by the other workers. *Id.*

FIRM:30566329v1

Almost a week later, the head janitor, Velton Cade, told the plaintiff that "he had seen two dead animals that appeared to be a rat and a pigeon in a plastic bag near a trash can at a garage in the work area." *Id.* "Plaintiff never observed the dead animals, but believed them to be in retaliation for having complained about the noose," and on June 20, 2003, she complained to Human Resources, who immediately scheduled a meeting with the plaintiff. *Id.* at *4.  On June 25, an investigation was conducted and it was again concluded that the noose was a joke directed at the white, male employee who was perceived by others to be a "loud mouth."  Human Resources determined that the noose was placed "near that employee's locker and over a chair often used by that employee when he was in the 'bum's room' and that the dead rat and pigeon had been placed electrocuted near a power station, and another employee had gathered them "in plastic bags and placed them near the trash can." *Id.* at *5.  The plaintiff sued her employer alleging, *inter alia,* race discrimination.  In granting summary judgment the district court held that there was insufficient evidence in the record to reasonably conclude "that any of these instances were based on race," the noose hanging included.  Acknowledging that it was "aware of the historical connotations of a noose as it relates to the civil rights struggles in this county," the court nevertheless held that:

> there is nothing in this case remotely suggesting that the noose at issue here was related in any way to race.  The noose was located in the "bum's room" in a building for which Plaintiff was not ordinarily responsible. Plaintiff had been filling in for another janitor on that day. **To conclude that the noose was based on race, even considering the historical connotations, would be to engage in speculation**. The only evidence before the Court is that the noose was aimed toward a white, male employee regarded as obnoxious and was intended as a practical joke.

Here, as in *Faulkner*, there is simply no evidence in the record that would allow a reasonable person to conclude that "the noose at issue here was related in any way to race." *Id.*

14

FIRM:30566329v1

at *18.  The record evidence establishes that on July 18, 2012, Militana and Nistico were having a conversation about capital punishment, that Nistico fashioned a hangman's noose out of a piece of surgical cord, and that after the conversation with Militana ended, Nistico put the piece of cord in his pocket, and the next day he put the cord on the outside of his own locker, which had "funny things on it," like a "radioactive material" sticker with the word "BIOHAZARD" under it and two WOW (Whip 'em out Wednesday) stickers, referencing a radio show called "Opie and Anthony." (56.1 at ¶¶ 42, 58-61, 63)  Plaintiffs both admit that there were no racist comments or innuendos written on the locker, and the record makes clear that Nistico knew very well which lockers were assigned to Plaintiffs.  (56.1 at ¶¶ 36-39, 41, 44)   If Nistico was trying to express a racial animus, or if he was going to do something to Plaintiffs "because of" their race, he would have put the "decorative" noose on one of their lockers, not his own, or he would have written the names or initials of Plaintiffs' on his locker next to the noose. (56.1 at ¶¶ 35-36, 63)  He also would not have immediately taken responsibility for putting up the noose on his own locker.

Based on this record, there is simply no evidence in the record that would allow one to conclude that Nistico's conduct of putting the surgical cord fashioned as a hangman's noose on his own locker was in any related to, or motivated by, the Plaintiffs' race.  Because there is no admissible evidence that would allow one to conclude that the July 19, 2012 locker room incident was race-based, the July 19, 2012 incident cannot, as a matter of law, be used to establish Plaintiffs' hostile work environment claims based on race. *See Francisco v. Verizon South, Inc.*, 756 F. Supp. 2d 705, 711, 727-28 (E.D. Virg. 2010) (rejecting the argument "that any image of a noose, no matter how innocuous, creates a hostile work environment" and holding that no evidence existed "to dispute the benign character of the noose in this case" where a "ClipArt" image of a noose was inadvertently displayed during a company meeting).  Since

15

there is no evidence of any other race-based conduct occurring within the applicable statutes of limitations, and Plaintiffs' conceded that their entire race discrimination claim was predicated on the mere existence of the noose in the workplace, summary judgment should be granted.

### B. Other Alleged Offensive Conduct Cannot be Considered by the Court

While Plaintiffs both testified at their depositions that the basis of their hostile work environment claims is solely the July 19, 2012 locker room incident, in the Complaint and at the depositions both Plaintiffs testified about other conduct that they found offensive during the tenure of their employment at the Hospital, even though they did not report the alleged offensive conduct.  (56.1 at ¶¶ 47, 49, 67, 72, 75, 79, 85-98)   Plaintiffs testified that prior to the July 19, 2012 noose incident the following things occurred: (a) sometime between 2004 and 2007, Nistico allegedly told Crawford that his hair looked like a Brillo pad, and that he had big lips (56.1 at ¶¶ 85-86); (b) in 2007 or 2008, Militana allegedly insisted to Crawford that Barack Obama was not smart because he was black and that Crawford voted for him because he was black (56.1 at ¶¶ 89-90); (c) more than once, Militana greeted Crawford in the bathroom upon seeing him with "how's it hanging" (56.1 at ¶ 91); (d) at some unspecified time, Militana approached Crawford in the staff lounge and asked him why African Americans refer to one another using the term "dog" (56.1 at ¶ 92); (e) in 2008, Militana allegedly told another doctor it's about time we get some whites in this institution (56.1 at ¶ 88); and (f) a long time before July 19, 2012, Cox heard Militana use the "N" word (56.1 at ¶ 96).  Since there is no evidence of the noose being race based, it is anticipated that Plaintiffs will try to use these alleged comments to establish a hostile work environment based on race.  For the reasons explained below, however, these comments cannot be used to avoid summary judgment.   The comments (1) are time-barred, and cannot be resuscitated by any sort of continuing violation theory, and (2) even if not time-barred, (which they are), cannot be used to defeat summary judgment because such acts

16

do not rise to the level of severe or pervasive and/or Plaintiffs themselves acknowledge that they did not believe these to be race-based.

### 1. The Applicable Statutes of Limitations

As previously stated, Plaintiffs bring their claims under Title VII, § 1981, and the NYSHRL.  As this Court knows, for a Title VII action to be timely, a plaintiff must file the charge with the EEOC within 300 days of the allegedly unlawful employment practice.  *See* 42 U.S.C. § 2000e-5(e); *Quinn v. Green Tree Credit* Corp., 159 F.3d 759, 765 (2d Cir. 1998); *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007).  The statute of limitations applicable to claims brought under § 1981, in New York, and the NYSHRL is three years. *See Tadros v. Coleman*, 898 F.2d 10, 12 (2d. Cir.) (per curiam), *cert. denied*, 498 U.S. 869 (1990); *Kassner*, 496 F.3d at 236.  At his deposition, Crawford testified that prior to the July 19, 2012 noose incident, on one occasion Nistico told him his hair looked like a Brillo pad and that on another occasion Nistico told him that he had big lips.  (56.1 at ¶ 85).  When asked when the two comments were made, Crawford testified that he did not know when the two comments were made, and based on his testimony the comments had to have been made sometime between 2004 and 2007. (56.1 at ¶ 86)  As for alleged racist comments made by Militana, Crawford also conceded at his deposition that he did not know when some of the alleged racist comments were made, and for those that he did have a recollection as to when they occurred, they occurred prior to January 2009.  (56.1 at ¶¶ 88-92).

Cox's deposition testimony establishes that prior to Crawford calling him into the locker room on July 19, 2012, to see Nistico's locker, that neither Nistico nor Militana had ever made any racially offensive comments or racial innuendo toward him. (56.1 at ¶¶ 95-96)  He did testify, however, that prior to the locker room incident, he had overheard Militana allegedly say to someone "it's about time we get some whites in here" and on another occasion allegedly use

17

the "N" word. (56.1 at ¶¶ 88, 96)  As to both of these occurrences, however, Cox's testimony

establishes that they both occurred outside the applicable statutes of limitations, as the first

comment was said in 2008, and the second comment was said at an "unknown" time, but that it

was made to a doctor that had not seen "for years" and it had happened "a good long time ago."

(56.1 at ¶¶ 88, 96)  In short, because all of the foregoing alleged racist comments by Nistico

and/or Militana occurred before July 12, 2010, three years before the filing of the lawsuit, the

comments cannot be used as a basis to claim hostile work environment based on race under §

1981 or the NYSHRL.[5]

Lastly, none of these other alleged racist comments can be resuscitated under Title VII on

the basis of a continuing violation theory because the continuing violation theory can only be

invoked where one act contributing to the hostile work environment occurred within the

applicable limitations period.  *See, e.g.*, *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d

Cir. 2010); *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, 2014 U.S. Dist. LEXIS

103474, at *32 (Bianco, E.D.N.Y. 2014) (*citing Raneri v. McCarey*, 712 F. Supp. 2d 271, 281

(S.D.N.Y. 2010).  If no discriminatory acts occurred within the limitations period, then the

hostile work environment claim must be dismissed. *See, e.g., McGullam*, 609 F.3d at 76-78

(dismissing hostile work environment claim where most recent relevant conduct occurred outside

the applicable limitations period).  In this case, because there is no evidence to suggest that the

noose at issue was in any way related to race, it cannot be said to have occurred within the

limitations period and then be used to bootstrap in the old stale claims.  Moreover, the Second

Circuit has held that gaps of one or more years between alleged incidents break the asserted

continuum of discrimination and preclude a finding of a continuing violation. *See Quinn v.

Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998); *see also Annis v. County of*

---

[5] Plaintiffs commenced this lawsuit on July 12, 2013.  See Docket Entries #'s 1 and 2.

FIRM:30566329v1

*Westchester*, 136 F.3d 239, 251 (2d Cir. 1998) (holding that six year gap precluded finding of

continuing violation).  Because the gaps in this case are way longer than one or more years, even

assuming *arguendo* that there was evidence to suggest that the noose was race based, which there

is not, the noose could not be used to bring in the comments allegedly made over the prior

decade.

 For all of the foregoing reasons, the time barred incidents should not be considered in

evaluating the race discrimination claims.

### 2. The Alleged Offensive Comments Based on Race Are Not Severe or Pervasive

 Even if there was evidence to establish that the hanging of the surgical cord on Nistico's

own locker was racially motivated towards Plaintiffs, (which there is not), and even if all of the

time barred comments were considered, (which they should not be), the hostile work

environment claims nevertheless fail as a matter of law for several independent reasons.

 First, when looked at in the context of their years of employment, (Crawford had worked

at the Hospital for 16 years and Cox had worked at the Hospital for 18 years as of the dates of

their depositions), it cannot reasonably be said that these isolated sporadic comments and

innuendo, by two different people, separated by ten years, amounts to an environment that is so

severe or pervasive that it rises to the level of actionable conduct. (56.1 at ¶1, 2, 7, 37).  *See*

*McCoy v. City of New York*, 131 F. Supp. 2d 363, 374 (E.D.N.Y. 2001) (holding that no hostile

work environment was created by two allegedly racist incidents, a display of a noose and a

racially offensive advertisement of an African-American man, as "two separate incidents . . . are

insufficient to permit a trier of fact to conclude that they pervaded [the plaintiff's work

environment"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (finding that

nine comments made over a seven month period were too infrequent to be severe and pervasive).

Indeed, the Second Circuit has consistently found that "[i]solated, minor acts or occasional

episodes do not warrant relief." *Brennan v. Metro. Opera Assoc., Inc.*, 192 F.3d 310, 318 (2d Cir. 1999); *see also Augustin v. Yale Club of N.Y.C.*, 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (finding "infrequent and sporadic" remarks made over the course of five years, "insufficient, as a matter of law, for Plaintiff to maintain a hostile work environment claim"), *aff'd*, 274 F. App'x 76 (2d Cir. 2008); *Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 167-68 (S.D.N.Y. 2006) (finding isolated incidents of supervisors calling plaintiff a "bitch" and making sexual remarks over five years of employment insufficient to support a claim of discriminatory harassment).[6]

Further, based on this record, no reasonable person could conclude that Plaintiffs had a subjective perception that the sporadic comments that they testified about hearing in the workplace prior to July 19, 2012 constituted discriminatory conduct on the basis of their race. Indeed, when the July 19, 2012 incident in the locker room occurred, and was being investigated, neither Plaintiff reported to anyone any other alleged discriminatory comments or conduct.  (56.1 at ¶¶ 47, 67, 72)  In fact, Plaintiffs tellingly acknowledged to Security and HR – when it was fresh in their minds and outside the auspices of any lawsuit – that they had experienced **no** other racial incidents at the Hospital other than the July 19, 2012 locker room incident for the entirety of their employment, whether involving Mr. Nistico or otherwise – none.  (56.1 at ¶¶ 47, 67, 72)

In addition, employment Policies **require** employees to promptly report any actual or perceived racial harassment or discrimination that they personally experience or witness.  (56.1 at ¶¶  22, 24, 27)  The reporting is not optional for employees, it is mandatory. (56.1 at ¶¶ 22, 24, 116-17)  Employees were required to immediately report experienced harassment. (56.1 at ¶¶ 22, 24, 116) ("If you feel that you have experienced or witnessed harassment of any kind, you must

---

[6] As this Court knows, irrespective of the basis of the hostile work environment, i.e. race, sex, age, etc., the same standard of law applies.  *Mathirampuzha v. Potter*, 548 F. 3d 70, 78 (2d Cir. 2008).

FIRM:30566329v1

immediately notify your supervisor."). Plaintiffs in this case admit that they were aware of Defendants' policies and procedures regarding non-discrimination in the workplace, and they admit that they were aware of Defendants' policies and procedures that required them to report any experienced race discrimination, and that they did not ever report the alleged racist comments. (56.1 at ¶¶ 26-27, 32, 79, 85, 87, 97) If Plaintiffs subjectively believed that the time barred comments were offensive to them on the basis of their race, they surely would have reported the conduct pursuant to the mandatory reporting requirements. Because they did not have a subjective belief that they were exposed to discrimination on the basis of their race, this is an independent basis for the Court to conclude that Plaintiffs have failed to make out a *prima facie* claim of race discrimination.

### C. The Alleged Discriminatory Conduct Cannot be Imputed to the Hospital

Finally, even assuming *arguendo* that all of the foregoing conduct was race based, was not time barred, was subjectively offensive to Plaintiffs, and was deemed to be severe or pervasive enough to have altered the terms and conditions of Plaintiffs' work environment, summary judgment must nevertheless be granted. As previously set forth, an employer can only be liable for alleged harassment perpetrated by coworkers and third parties if there is evidence in the record that the employer either provided no reasonable avenue of complaint or knew of the harassment and did nothing about it. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (*quoting Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir. 1994); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998).

Based on the undisputed evidence in this record, no reasonable person could conclude that liability should be imputed to the employer since (i) the Hospital has strict policies and procedures prohibiting discrimination (as well as retaliation) in its workplace, and (ii) as soon as

21

any type of inappropriate conduct came to the attention of the Hospital, the report from Security

on July 19, 2012, prompt reasonable action was taken. (56.1 at ¶¶ 19-27, 57-78)  *See Notaro v.*

*Fossil Industries, Inc.*, 820 F. Supp. 2d 452, 459 (E.D.N.Y 2011) (holding that the employer

provided a reasonable avenue of complaint where Plaintiffs received a handbook that "contained

a clearly articulated policy and procedure in the event an employee wished to make a complaint

regarding sexual harassment"); *Brown v. Orange & Rockland Utils., Inc.*, 594 F. Supp. 2d 382,

394 (S.D.N.Y. 2009) (holding that the employer provided a reasonable avenue of complaint

where it "maintain[ed] a written policy that establishes fairly comprehensive procedures and

guidance regarding workplace behavior, discrimination, and the proper handling of

discrimination  claims at the supervisory level," investigated the plaintiff's complaints about a

noose and other incidents and made itself available to the plaintiff when he complained).

  Moreover, Plaintiffs cannot dispute that the Hospital acted proactively and promptly.

First, Plaintiffs did not even report the conduct that they now claim is racist to their supervisors

or to HR, which is required by the applicable policies.  (56.1 at ¶¶ 24, 43, 50-52, 118)  Rather,

Crawford reported the noose to Security because he believed that a crime was committed. (56.1

at ¶ 43)  Security conducted an investigation and also immediately reported the presence of the

rope on Nistico's locker to Hospital management.  (56.1 at ¶¶ 45-48, 51).  Management, upon

getting the report from Security, immediately disbursed personnel to find out the details of what

happened and upon doing so that personnel promptly reported the matter to HR. (56.1 at ¶¶ 50,

52-55)  HR, like everyone else, acted promptly and commenced an investigation, which included

interviewing Nistico, Crawford and Cox within one day of the incident. (56.1 at ¶¶ 54-72)  Since

Nistico immediately took responsibility for the offending conduct, apologized for the conduct,

had never before been the subject of any alleged wrongful, offensive or inappropriate conduct or

complaints, and because Crawford and Cox confirmed that they had not previously been exposed to any disrespectful or inappropriate conduct by Nistico (or Militana for that matter), the Hospital made the business decision to suspend Nistico without pay for five (5) days and to require him to attend a diversity and inclusiveness class, which he did.  (56.1 at ¶¶ 52-53, 64, 67, 72-78)  *See Salmon v. Pliant Corp.*, 965 F. Supp. 2d 302, 306 (W.D.N.Y. 2013) (holding that the employer sufficiently disciplined an employee who had made a racial slur when the employee "was counseled by [the employer] concerning the need for employees to treat one another with respect"); *Wilson v. N.Y. City DOT*, 2005 U.S. Dist. LEXIS 21620, at \*62 (S.D.N.Y. Sept. 27, 2005) (holding that the employer properly addressed a complaint about a noose where it "interviewed purported witnesses" and "employees were required to attend EEO training"); *Bright v. Coca Cola Refreshments USA, Inc.*, 2014 U.S. Dist. LEXIS 155565, at \*25 (E.D.N.Y. Nov. 3, 2014) (rejecting the plaintiffs' argument that an investigation "was insufficient, because no one was disciplined, the investigation was 'outsourced,' and only two workers were interviewed" as the plaintiffs "d[id]not explain how these alleged deficiencies rendered the steps that defendant took unreasonable" and approving of the defendant's response because "[it] was immediate and reasonable, and there have been no subsequent incidents of a similar nature"); *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 (2nd Cir. 2011) (affirming the dismissal of the plaintiff's hostile work environment claim under Title VII because the alleged harasser was not the plaintiff's "supervisor and there was no evidence from which a reasonable jury could find that the Diocese knew or should have known about the alleged harassment"). Based on this record, no person could conclude that the Hospital failed to act reasonably.

In regards to the sporadic racist comments that Plaintiffs now allege occurred throughout their almost two decades of employment, both Plaintiffs concede that they did not complain

FIRM:30566329v1

about such conduct to the Hospital or the Health System so there can be no basis to hold the employer liable for negligence. (56.1 at ¶¶ 32, 79, 85, 87, 97) *See Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) ("employer will be held liable only for its own negligence," and a plaintiff must demonstrate that the employer "failed to provide a reasonable avenue for complaint" or that "it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.")  In fact, when Cox was asked specifically if anyone in management ever observed Nistico doing something inappropriate and failed to take action, he testified unequivocally that, "[t]hey didn't know." (56.1 at ¶ 84)  Cox also conceded that he never reported inappropriate conduct to anyone at the Hospital about Militana and that he was not aware of anyone ever complaining about Nistico or Militana.  (56.1 at ¶ 97)  Crawford conceded the same facts at his deposition, that is that he never reported Nistico or Militana's alleged inappropriate comments to the Hospital, and he is unaware of anyone else ever reporting to the Hospital that Nistico or Militana engaged in improper conduct. (56.1 at ¶¶ 79, 85, 87)  Based on this record, summary judgment is required as there is no basis to conclude that the Hospital either provided no reasonable avenue of complaint or knew of the alleged harassment and did nothing about it.

## II. **Plaintiffs' Retaliation Claims Also Fail As A Matter of Law**

Title VII, § 1981, and the NYSHRL all prohibit employers from engaging in retaliatory action against employees for opposing unlawful employment practices. Retaliation claims under these statutes are analyzed under, and subject to, the three-step burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014).[7]  To prevail under the

---

[7] Retaliation claims under Title VII and the NYSHRL are subject to the same analytical framework.  *Lovejoy-Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001).

FIRM:30566329v1

*McDonnell Douglass* framework, i.e. survive summary judgment, the plaintiff must first be able to establish a *prima facie* case of retaliation by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  In accordance with this standard, the evidence in this case establishes beyond dispute that Plaintiffs cannot carry their burden of establishing a *prima facie* case of retaliation for several reasons.[8]

First, it is questionable that Plaintiffs engaged in protected activity in the first instance. "[A] complaint is not protected activity unless it puts the employer on notice that the employee is protesting unlawful discrimination." *Tomasino v. St. John's Univ.*, 2010 WL 3721047, at *10 (E.D.N.Y. Sept. 23, 2010) (emphasis added), *aff'd*, 476 F. App'x 923 (2d Cir. 2012); *see also Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988) (holding that a complaint directed at conduct outside the definition of unlawful employment practice under Title VII cannot support a claim for retaliation). As one district court has observed, "[u]nfair treatment . . . is not actionable under the civil rights laws and a complaint about it does not constitute protected activity.  To be actionable, the unfair treatment must be due to one's membership in a protected class and the complaint must make that point sufficiently clear." *Ramos v. City of N.Y.*, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997).

In this case, the evidence establishes that Plaintiffs did not ever use the Hospital's complaint procedures to report discriminatory conduct, as the relevant policies require that the complaints of discrimination be directed to supervisors or to HR.  (56.1 at ¶¶ 24, 118) Crawford did not report discriminatory conduct to his supervisors or HR, but rather reported to Security

---

[8] Defendants do not burden the Court by unnecessarily setting forth the remaining law applicable to the burden shifting analysis.

what he believed to be a crime committed by Nistico.  (56.1 at ¶ 43) *See Dye v. State Dep't of Corr.*, 2011 U.S. Dist. LEXIS 75366, at *14-15 (S.D. Ind. July 12, 2011) (holding that the "filing of an incident report" concerning a hate crime - involving race - did not fit within the statutory definition of protected activity, because the plaintiff was not opposing an unlawful employment practice).

Second, even if the reporting to Security of a perceived crime is found to be protected activity under the anti-discrimination laws applicable to this case, Plaintiffs' claims for retaliation still fail for various independent reasons: (i) they fail because no reasonable person could believe that the mere existence of a rope on a co-worker's locker, without any context indicating racial animus, is an unlawful employment practice; (ii) they fail because there is no evidence in the record of an adverse employment action; and (iii) they fail because there is no evidence of causal connection, all necessary elements of establishing a *prima facie* case of retaliation.

The case of *Satterwhite v. City of Houston*, 2015 U.S. App. LEXIS 3370 (5th Cir. 2015), demonstrates one of the many deficiencies in Plaintiffs' retaliation claims.  In *Satterwhite*, the plaintiff alleged that he engaged in two distinct protected activities: (1) making an oral report to human resources that one of the other employees ("Singh") said "Heil Hitler" in a meeting, which he found to be offensive and believed to be in violation of the policy prohibiting employees from using "inappropriate or offensive racial, ethnic or gender slurs, connotations, words, objects, or symbols," and (2) answering questions in connection with the investigation of the "Heil Hitler" incident.  In concluding that that Satterwhite's actions could possibly qualify as "opposing" under 42 U.S.C. § 2000e-3(a), the retaliation claim still had to fail as a matter of law because in order that the opposing conduct be protected activity, there had to be a reasonable

belief that Singh's offensive comment Heil Hitler created a hostile work environment under Title

VII.  In upholding the district court's grant of summary judgment, the Fifth Circuit held that "No

reasonable person would believe that the single 'Heil Hitler' incident is actionable under Title

VII" and reiterated the Supreme Court has made clear that isolated incidents of non-extreme

conduct are insufficient as a matter of law.  As such, no reasonable person could believe that the

Heil Hitler comment, no matter how offensive or inappropriate, violated the anti-discrimination

statutes.  *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 349 (5th Cir. 2007)

("Because Turner could not have reasonably believed that Colston's conduct . . . constituted an

unlawful employment practice under Title VII, this incident cannot give rise to protected

activity."); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam)

(dismissing a retaliation claim because "[n]o reasonable person could have believed that the

single incident recounted above violated Title VII's standard.").  In this case, Plaintiffs did not

believe that they were opposing an unlawful employment practice, which is made evident by the

fact that they did not utilize the mandatory reporting policies for actual or perceived

discrimination.  Rather, they believed that the display of a noose in a work place was a crime, a

crime that was committed by Nistico, not the employer, and they reported it to Security. (56.1 at

¶ 43)  Moreover, even if the Court concludes that the report to Security qualifies as "opposing" a

practice, the retaliation claims must still fail because Plaintiffs could not have reasonably

believed that they were opposing an unlawful employment practice.  In this regard, it is worth

reminding the Court that Plaintiffs told Security and Solivan during the investigation into the

rope on the locker that there were no prior problems with Nistico, and that they had not

experienced any other instances of offensive conduct by Nistico or anyone else. (56.1 at ¶¶ 32,

49)

27

The retaliation claims also fail because the deposition testimony of Plaintiffs establishes that they were not subjected to any type of cognizable adverse employment action. *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2012). In this regard, both Plaintiffs conceded that in the days, weeks, months and years after HR spoke to them about the July 19, 2012 locker room incident, the terms and conditions of their employment at the Hospital had not changed. Specifically, both Plaintiffs admitted: that their salaries had stayed the same, or gone up; that their benefits had stayed the same; and that their job duties and assignments had stayed the same. (56.1 at ¶¶ 100-115) In fact, when Crawford was asked if he was subjected to any type of adverse or negative employment action as a result of reporting the noose incident, he affirmatively stated they all remain the same pretty much. (56.1 at ¶ 99) This lack of evidence to establish an adverse employment action taken by the employer is fatal to the retaliation claims, *see Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 572 (2d Cir. 2011), (which also necessarily impedes Plaintiffs' ability to establish any sort of causation). As such, Plaintiffs cannot establish a *prima facie* case of retaliation and summary judgment must be granted.

### III. Plaintiffs' Claims Against Nistico Must Be Dismissed

In addition to the infirmities set forth above pertaining to Plaintiffs' claims of hostile work environment discrimination and retaliation, the claims against Nistico in his individual capacity fail for additional reasons.[9] In regards to the § 1981 claim, while individual liability can exist, it is only when the record evidence establishes that the individual is a supervisor. For example, in *Hicks v. IBM*, 44 F. Supp. 2d 593, 597 (S.D.N.Y. 1999), the court held that individuals can "be held liable under § 1981 only when they are essentially one and the same with the employer; that is when they have the capacity to make and enforce the contract between the employer and the employee." *Id.* at 597 (relying on *Bellows v. Amoco Oil Co.,* 118 F.3d 268,

---

[9] The Complaint appears to allege individual claims against Nistico under § 1981 and the NYSHRL.

FIRM:30566329v1

274 (5th Cir. 1997)).   Decisions issued from the Second Circuit appear to be in accord with

these principles concerning individual liability under § 1981.  A year after *Hicks* was decided, in

*Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000), the Second Circuit,

in connection with its analysis of individual liability under § 1981, cited *Hicks* for the

proposition that liability can exist against supervisors.  In the parenthetical, the Second Circuit

stated: "'In each of the cases that have allowed individual liability, the individuals have been

supervisors who were personally involved in the discriminatory activity.'"  *Id.* (*citing Hicks,* 44

F. Supp. 2d at 597).  A few years later, in *Callahan v. Consolidated Edison Co. of New York*, 187

F. Supp. 2d 132, 137 n.31 (S.D.N.Y. 2002), the court cited *Hicks* to state that "in each of the

cases that have allowed individual liability, the individuals have been supervisors who were

personally involved in the discriminatory conduct." (*citing Hicks,* 44 F. Supp. 2d at 597).  This

same principle was recently reiterated in *De La Peña v. Metro. Life Ins. Co.*, 953 F. Supp. 2d

393, 409 (E.D.N.Y. 2013).   Since Nistico was not, and has never been, a supervisor to Plaintiffs,

summary judgment should also be granted on the individual claim against him under § 1981.

(56.1 at ¶ 15)  This basis for summary judgment is separate and apart from the fact that summary

judgment should be granted due to the fact that there is no evidence that would allow a

reasonable juror to conclude that the display of the hangman's noose was motivated by race (see

above), and because of the fact that the two race based comments that were alleged by Crawford

to have been made by Nistico sometime in or around 2004 to 2007 are time barred and therefore

cannot lie as the predicate for an intentional discrimination claim under § 1981.  (56.1 at ¶ 86)

Additionally, separate and aside from all of the foregoing deficiencies in Plaintiffs' claims,

individual liability under § 1981 requires specific evidence upon which a reasonable juror could

conclude that the infringement of the rights protected by § 1981 was intentional.  In this case,

FIRM:30566329v1

Plaintiffs have not produced any evidence that would allow a rationale person to conclude that Nistico intentionally deprived them of any right protected under by § 1981.  In fact, the evidence is to the contrary.   Crawford, when pressed at his deposition, ultimately conceded for all intents and purposes that he does not have any reason to think that Nistico has a racial animus or dislike of African Americans.  (56.1 at ¶ 98)  Because the record is void of any evidence to reflect intentional discrimination on the basis of race, summary judgment must also be granted as to the individual § 1981 claim brought against Nistico.

Finally, the individual claim against Nistico under the NYSHRL must also be dismissed for a separate and distinct reason.  Under the statutory scheme, an individual cannot be liable as an aider and abettor if the employer cannot be held liable.  *See Alexander v. Westbury Union Free Sch. Dist.*, 2011 U.S. Dist. LEXIS 127738, at *63 (E.D.N.Y. 2011) (holding that in absence of employer liability, an individual cannot aid and abet his or her own behavior).  As demonstrated above, the hostile work environment claims and the retaliation claims against the Hospital and the Health System fail for a multitude of reasons.  See above Points I and II.  Since the claims against the corporate Defendants fail as a matter of law, summary judgment must also be granted to Nistico under the NYSHRL.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court grant their motion for summary judgment, dismiss this case in its entirety, and grant any other and further relief it deems just and proper.

Dated: June 19, 2015
New York, New York

*Respectfully submitted,*

By:  /s/ *Traycee Ellen Klein*
_____

FIRM:30566329v1